**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

DONNA TOMAZIN, as the Surviving )
Daughter of ANN TOMAZIN, deceased, )
                                         )
       **Plaintiff,**                 )
                                           )
**v.**                                      )       **Case No. 3:13-cv-0875**
                                           )       **Judge Aleta A. Trauger**
LINCARE, INC. and AIRSEP CORP., )
       **Defendants.**            )
                                           )

## MEMORANDUM

Pending before the court are the following motions: 1) a Motion for Summary Judgment by defendant Lincare, Inc. ("Lincare") (Docket No. 78); 2) a Motion for Summary Judgment by defendant AirSep Corp. ("AirSep") (Docket No. 81); 3) Motions to Exclude Ann Tomazin's ("Decedent's") treating physician, Dr. Travis Purdue, from offering testimony on medical causation (Docket Nos. 76 and 95); and 4) Motions to Exclude plaintiff's product defect expert, Tyler Kress, Ph.D. (Docket Nos. 84 and 89).  All are opposed by plaintiff Donna Tomazin, surviving daughter of Decedent ("Plaintiff").  For the reasons discussed herein, the Motions for Summary Judgment as well as the Motions to Exclude Dr. Pardue will be granted, the Motions to Exclude Dr. Kress will be denied as moot, and the entire action will be dismissed with prejudice.

## BACKGROUND[1]

---

[1] The facts in this section are framed in the light most favorable to Plaintiff.  Therefore, where there is a dispute, the facts are drawn from Plaintiff's Responses to defendants' Statements of Undisputed Material Facts and/or Plaintiff's briefing on these motions.  Where the evidence cited by Plaintiff is unclear, the court recounts the interpretation most generous to Plaintiff's position. This section includes only those facts that are relevant to the court's analysis.

Decedent suffered from Chronic Obstructive Pulmonary Disease ("COPD") and was prescribed home oxygen supplementation at a rate of 2 liters per minute ("LPM")[2] from 2005 onward. Certificates of Medical Necessity signed by Decedent's physicians from 2005 through 2011 indicate that this supplementation was medically necessary. Accordingly, from 2005 through the time of her final hospitalization in November 2011, Decedent leased oxygen concentrators through Lincare, a company that purchases medical equipment from manufacturers and rents that equipment to patients. On November 11, 2011, a Lincare representative replaced the machine Decedent was formerly using with an oxygen concentrator that was manufactured by AirSep, which Decedent then used from November 11 through November 13, 2011 ("the Concentrator").

Lincare did not manufacture the Concentrator, but it had been owned by Lincare from the time of its manufacture by AirSep and was leased to one other patient prior to Decedent, whose identity Lincare has refused to disclose (the "Prior Patient"). The Concentrator was removed from the Prior Patient's home by Lincare on November 3, 2011 for reasons that are unconfirmed. Lincare does not document why machines are removed from a patient's home and has been unable to provide any additional information about the Concentrator during its use by the Prior Patient. It is known, however, that the use hours on the Concentrator were relatively low when it was taken from the Prior Patient, and also that the Prior Patient received a different machine in

---

[2] While the parties do not explain what "LPM" means in detail, it appears from industry websites that LPM refers to a continuous flow of oxygen from an oxygen concentrator, where the rate remains consistent, irrespective of the patient's breathing pattern. This is in contrast to a pulse dose, in which oxygen is delivered only when the patient inhales.

exchange.[3]  The Concentrator remained in Lincare's possession from the time it was taken from the Prior Patient on November 3, 2011 until it was delivered to Decedent on November 11, 2011, and Lincare never sent it away for service or repair.

Lincare never itself repairs the oxygen concentrators it leases; any machines in need of repair are sent back to the manufacturer.  Lincare is, however, responsible for regular maintenance and service checks, which include checking the oxygen concentration levels of the machines and cleaning the filters.  According to Lincare's own internal policies, Lincare is also supposed to confirm the full functioning of a machine before it is delivered to a new patient, including – among other things – that the actual oxygen flow rate matches the machine's setting. There is evidence to suggest that Lincare neglected to confirm that the Concentrator's actual flow rate matched the setting before delivering the Concentrator to Decedent.

During the two days that Decedent used the Concentrator, her condition rapidly and unexpectedly declined.  On November 10, 2011, the day prior to Decedent's receipt of the Concentrator, Decedent's condition had been good: her oxygen saturation level was 98% when checked by a home nurse, and she was alert, talking and happy.  Following the replacement of her prior oxygen machine with the Concentrator on the morning of November 11th, she began to experience repeated episodes of confusion and to have difficulty breathing, continuously complaining that she could not breathe through her nose, though her condition would temporarily improve whenever she was removed from the Concentrator and placed on her BiPAP machine.[4]

---

[3] These facts could be construed as indicating that Lincare pulled the Concentrator from the Prior Patient's home due to concerns with its function and that the Concentrator should have been fully evaluated before it was issued to Decedent.

[4] In February of 2011, Decedent was prescribed intermittent use of a BiPAP machine to treat her respiratory conditions and sleep apnea, in addition to her regular use of an oxygen concentrator.

By Sunday, November 13, 2011, Decedent was having difficulty walking, her breathing difficulties had increased so that she was taking big gasps of air, and while napping, she began to convulse. That evening, Decedent's caregiver called 911 and a Sumner County Emergency Medical Services team (the "EMS team") was dispatched to Decedent's home. The EMS team's report – while written in shorthand that makes it difficult to decipher in its entirety – appears to indicate that Decedent's oxygen level was only 72% and that she was incoherent at the time they arrived, despite the fact that she had been using the Concentrator. After Decedent was placed inside an ambulance and connected to the oxygen machine therein, her oxygen level rose to 99-100%, and she immediately appeared to regain some of her cognitive abilities, telling the EMS team her name and home address, and stating that she felt better.

The EMS team transported Decedent to Hendersonville Medical Center ("HMS"). On arrival, Decedent was found to be in respiratory failure. She was intubated in the Emergency Room and then transferred to the Critical Care Unit, where a physician consult note stated that she appeared to have hypercapnic respiratory failure, most likely caused by exacerbation of her COPD. She was placed on a ventilator and received aggressive treatment, but her condition only minimally improved[5] and, on November 20, 2011, she went into severe respiratory distress and

_____

While the parties do not define "BiPAP machine" it appears to refer to a bilevel positive airway pressure machine, which – according to industry sources – delivers oxygen in a more pressurized form than an oxygen concentrator and also fluctuates the pressure of the air such that there is high pressure when the patient breathes in and low pressure when the patient breathes out.

[5] The characterization of Decedent's condition while at HMS as only "minimally improving" is drawn from the fact section of Plaintiff's Response to Lincare's Motion for Summary Judgment (Docket No. 98 at p.13); Plaintiff, however, does not dispute – for the purposes of Lincare's Summary Judgment Motion – that, after being unconscious for several days on the respirator, Decedent then regained consciousness and informed her doctors that she did not want to be placed on a ventilator again (Docket No. 99 at p.14).

died at the age of 86.  The immediate cause of death was listed on her death certificate as hypercapnic respiratory failure, with COPD and pneumonia also listed as underlying and contributing causes.

Dr. Travis Pardue had been Decedent's primary care physician treating her for pulmonary issues from approximately 2006 onward.   He provided prescriptions for Decedent's medical devices, medications, and home health care, including instructions for Decedent to receive twenty-four hour oxygen supplementation at 2 LPM.  Some of these prescriptions were issued very shortly before November 11, 2011, and were intended to cover the time period through the date of Decedent's death.  It is undisputed, however, that the last date Dr. Pardue treated Decedent was April 14, 2011, and that Dr. Pardue was not directly involved in Decedent's care during the time period from November 11-13, 2011, or during her subsequent hospitalization at HMS.[6]

After her mother's death, and in light of the fact that Decedent's health had declined so rapidly after she began using the Concentrator, Plaintiff decided to have the Concentrator checked.  In January of 2012, Plaintiff brought the Concentrator to Medical Necessities on

---

[6] Plaintiff asserts that Dr. Pardue was Decedent's primary care physician *until* the time of her death.  The court notes that this argument is really one of semantics.  April 14, 2011 is the date of Dr. Pardue's last examination of Decedent according to his treatment notes; these notes do not include any mention of Decedent's death or her cause of death.  November 8, 2011 is the last date a prescription renewal (for nebulizer medication) was signed by Dr. Pardue, though this prescription was not accompanied by any updated notes about Decedent's condition and, therefore, appears to have been issued as a matter of routine.  Defendants have therefore asserted in their briefing that Dr. Pardue last treated Decedent on April 14, 2011.  Plaintiff has conceded this point by neither challenging it in her briefing nor producing any evidence that Dr. Pardue examined Decedent after April 14, 2011, consulted on her care in any way after that time other than renewing ongoing prescriptions and care plans, or participated in her care in any way at all after November 11, 2011.

Charlotte Avenue in Nashville, a company that rents medical equipment. An employee there found that the Concentrator's oxygen concentration level was good but that the flow rate did not match the setting, even after changing the batteries: while set for a continuous flow rate of 2 LPM, the Concentrator in fact delivered only 0.5 LPM; and when set at 5 LPM, the Concentrator only delivered 1.6 LPM. In addition, when tubing attached to the Concentrator was placed in a glass of water, it did not blow bubbles.[7] Plaintiff repeated this water glass test several times on her own with the same results.

Plaintiff then retained an attorney, Rick Piliponis,[8] who sent the Concentrator to Pitcock Biomedical, Inc. ("Pitcock") for testing on April 4, 2012. Pitcock President and Operations Manager Mark Wooten tested the Concentrator and found that, when set at a continuous flow rate of 2 LPM (as Decedent had been prescribed), the Concentrator delivered only 0.51 LPM of oxygen. Other settings he tested revealed a similar discrepancy (at a setting of 1 LPM, the Concentrator delivered 0.12 LPM; at a setting of 3, it delivered 0.75; at a setting of 4, it delivered 1.10; and at a setting of 5, it delivered 1.88). After Mr. Wooten verified the output pressure with a pressure gauge, however, the Concentrator inexplicably began to deliver a flow rate consistent with its setting in all subsequent testing. Mr. Wooten therefore determined that the Concentrator may have an "intermittent flow problem."

---

[7] There is a dispute as to whether this evidence would be admissible at trial or qualify as hearsay. The employee of Medical Necessities who performed the tests and reported the results to Plaintiff has not been named, nor has he provided any testimony or affidavit in discovery. The court recounts this incident as part of Plaintiff's narrative leading up to the lawsuit but does not need to reach the question of admissibility. As discussed more fully herein, Plaintiff's claims are dismissed on other grounds, even if all facts evidencing a defect in the Concentrator are admissible and found to be true.

[8] Mr. Piliponis is not representing Plaintiff in this action.

**PROCEDURAL HISTORY**

On November 13, 2012, Plaintiff filed a lawsuit against Lincare in Sumner County, Tennessee Circuit Court. On November 26, 2012, Plaintiff voluntarily dismissed that action.

On July 30, 2013, Plaintiff refiled her lawsuit against Lincare in Sumner County, bringing claims for negligence, negligent misrepresentation, and breach of warranty of merchantability and seeking damages in the amount of $2 million for her own loss of consortium and emotional distress, as well as for Decedent's physical pain and suffering, and the costs accrued for Decedent's medical care and funeral expenses. (*See* Docket No. 1, Ex. 1.)

On August 30, 2013, Lincare filed an uncontested Notice of Removal to the United States District Court for the Middle District of Tennessee, on grounds of diversity jurisdiction. (Docket No. 1.)

On September 9, 2013 Lincare filed an Answer, denying Plaintiff's allegations that the Concentrator did not function properly and asserting, in the alternative, that, if the Concentrator in fact did not function properly, AirSep – as the manufacturer – is legally responsible for any injuries or damages. (Docket No. 5.)

On October 4, 2013, with leave of court, Plaintiff filed a First Amended Complaint, adding AirSep as a defendant. (Docket No. 8.) The factual allegations, causes of action, and damages sought remained substantially the same.

On October 17, 2013, AirSep and Lincare each filed Answers to the First Amended Complaint. (Docket Nos. 10 and 11.)

On January 15, 2014, the court entered an Initial Case Management Order (the "CMO"). (Docket No. 24.) In relevant part, the CMO noted that the parties had thirty days to make their Initial Disclosures, pursuant to Fed. R. Civ. P. 26(a)(1), and also set the following deadlines:

7

August 15, 2014 for parties to complete all written discovery and depose all fact witnesses;

September 15, 2014 for Plaintiff to identify and disclose all expert witnesses and expert reports;

October 15, 2014 for defendants to complete depositions of Plaintiff's expert witnesses; and

January 15, 2015 for parties to file all dispositive motions. Also on November 15, 2014, the

court entered an Order setting the case for trial on June 2, 2015. (Docket No. 25.)

On February 21, 2014, Plaintiff served defendants with her Initial Disclosures, which

listed – among others – Dr. Travis Pardue, Decedent's "primary care physician," as an individual

"likely to have discoverable information that Plaintiff may use to support its claims or defenses."

(Docket No. 91, Ex. 4.) Attached to Plaintiff's Initial Disclosures were two documents of

correspondence with Dr. Pardue. The first was a December 13, 2012 letter from Dr. Pardue to

Thomas Carlton, Jr., an attorney who represented Plaintiff in the filing of her first suit in Sumner

County that was voluntarily dismissed, wherein Dr. Pardue said that he "agree[d] within a degree

of medical certainty that the [Concentrator's] flow rate of 0.5 LPM, which should have been 2

LPM, *contributed* in the decline of [Decedent's] health conditions during November 11, 2011 to

November 13, 2011 *in result of her death*." (Docket No. 91, Ex. 4 (emphases added).)[9] The

_____

[9] This letter was apparently written in response to a November 9, 2012 letter from Mr. Carlton to Dr. Pardue, which was not attached to Plaintiff's Initial Disclosures. That letter pointedly asked if Dr. Pardue could "state within a reasonable degree of medical certainty that the [Concentrator's] flow rate of 0.5 LPM, which should have been 2 LPM, *caused* the decline in [Decedent's] health between November 11, 2011 to November 13, 2011 *and her ultimate death* on November 21, 2011." (Docket No. 91, Ex. 9, Zenner Declaration, Ex. A thereto(emphases added).) As an aside, the court notes that this letter, which was drafted very early on in the litigation and prior to discovery, also indicated a slightly different version of the facts, namely that the Concentrator had been used by Decedent prior to November 11, 2011, but had been picked up and serviced by Lincare and then redelivered to Decedent on November 11, 2011. Since discovery, the parties now agree that these facts are not correct, and Plaintiff now presents the version of the facts recounted above. Most significantly, Plaintiff no longer alleges that Lincare ever performed any repairs on the Concentrator.

second was a March 5, 2013 typed letter from Malcolm McCune, Plaintiff's current counsel, to Plaintiff, stating: "Please confirm that Dr. Pardue can say: 1) He is familiar with the standard of care regarding equipment providers who rent equipment to satisfy a Doctor's prescription for oxygen supplementation at the rate of 2 liters per minute – to provide equipment that does what it says it does, rather than .5 liters per minute when the dial is set at 2 liters per minute. 2) That Lincare violated that standard by providing a machine that only provided .5 liters per minute when set at 2 liters per minute. 3) That violation, more likely than not, caused her death." Dr. Pardue handwrote the word "yes" beneath each of these three opinions and signed the bottom of the page.

On April 16, 2014, Plaintiff served Lincare and AirSep with Answers to their Interrogatories. (Docket No. 91, Ex's. 5-6.) In response to Lincare's and AirSep's interrogatory requests for expert witness disclosures, Plaintiff stated: "No decision has been made regarding the use of expert testimony. Experts will be disclosed in compliance with the initial case management order. Without waiving this objection Plaintiff anticipates the following individuals will provide testimony that may qualify as expert testimony. . ." She then went on to list two individuals: Mr. Wooten, who would potentially testify as to the alleged defect with the Concentrator;[10] and Dr. Pardue, for whom the only information she provided was that he may testify on "cause of death based on facts provided."

On July 2, 2014, a Litigation Paralegal at Hall Booth Smith, the law firm representing AirSep in this action, sent an email to Matthew Zenner, counsel for Plaintiff, asking to set the depositions of Plaintiff's "stated expert witnesses, Dr. Pardue and Mark Wooten." (Docket No. 91, Ex. 7.) On July 7, 2014, Mr. Zenner replied: "We disclosed those two as individuals who

[10] Mr. Wooten's testimony is not pertinent to the pending motions.

might provide testimony that is considered expert testimony.  We haven't retained either as our expert witness so you can contact them directly to work on scheduling."  *Id.*

Subsequently, the court – in response to motions by the parties – entered a series of Orders amending the CMO, in relevant part, as follows.  On July 25, 2014, the court entered an Agreed Order tendered by the parties that extended the deadline for deposing Dr. Pardue to October 15, 2014, beyond the initial CMO fact witness deadline due to his unavailability for medical reasons, and stated: "Dr. Pardue is an important witness as he was involved in the treatment of [Decedent], and Plaintiff has indicated in her discovery responses that the possibility exists she may use Dr. Pardue as an expert witness in her case.  While Plaintiff's counsel has stated the final determination to consider Dr. Pardue as an expert witness has not been made, Defendants must treat Dr. Pardue as a fact witness at this time.  Therefore, his deposition would fall under the fact witness deadline."  (Docket No. 40.)  On September 15, 2014, at Plaintiff's request, the court extended the deadline for Plaintiff's expert disclosures to November 1, 2014; for defendants' deposition of Plaintiff's experts to December 15, 2014; and for the filing of dispositive motions to February 15, 2015.  (Docket No. 49.)  On September 19, 2014, in an Agreed Order tendered by the parties, again indicating that Dr. Pardue is a fact witness, the court extended the deadline for deposing Dr. Pardue to November 30, 2014, based on his continued unavailability.  (Docket No. 51.)  On December 17, 2014, (after the final deadline for Plaintiff's expert disclosures had passed) the court granted an agreed motion that further extended the following deadlines: February 16, 2015 for Dr. Pardue's deposition (noting his ongoing

unavailability)[11] and January 15, 2015 for defendants to depose Plaintiff's experts. (Docket No. 54.)[12] This Order also required defendants to disclose their expert witnesses regarding the Concentrator by January 30, 2015, but delayed the deadline for defendants to disclose their medical experts until after the deposition of Dr. Pardue. *Id*. On February 27, 2015, pursuant to agreement of the parties, the court extended the deadline for dispositive motions to May 15, 2015 (Docket No. 60) and reset the trial for October 20, 2015 (Docket No. 61). On March 4, 2015, due to internal court scheduling issues, the court rescheduled the trial for November 17, 2015, and set a deadline of November 10, 2015 for parties to file witness lists and expert witness statements, as described in Local Rule 39.01(c)(6)c. (Docket No. 62.)

To date, Plaintiff has not disclosed Dr. Pardue as an expert witness on medical causation or produced a Rule 26 expert report.[13] The deadlines for Plaintiff's expert disclosures have long since passed. Plaintiff has never asked for any additional deadline extensions. Plaintiff has also not identified anyone other than Dr. Pardue who might offer expert medical causation testimony.

---

[11] There is nothing in the record beyond this date regarding the scheduling of Dr. Pardue's deposition or other communications between the parties about his role in the litigation. As of the time the pending motions were filed, Dr. Pardue remains unavailable. (Docket No. 91, Ex. 9.)

[12] In several places in this motion, "2014" was written instead of "2015," but as the Order was filed in late 2014, it is clear that the parties intended and the court understood these deadlines to take place in 2015.

[13] While Plaintiff's Initial Disclosures included Dr. Pardue as a fact witness and referenced the *possibility* that he would offer an expert opinion as to medical causation, Plaintiff explicitly stated to defendants in her subsequent Responses to Interrogatories that no final decision had been made regarding the use of expert testimony and that experts would be disclosed in compliance with the CMO. Plaintiff never followed up with an official disclosure or expert report.

On May 15, 2015, Lincare filed a Motion to Exclude Dr. Pardue from offering expert testimony as to Decedent's cause of death, along with a supporting Memorandum. (Docket Nos. 76 and 77.) On June 1, 2015, Plaintiff filed a Response. (Docket No. 91.) On June 22, 2015, with leave of court, Lincare filed a Reply in support of its Motion to Exclude Dr. Pardue. (Docket No. 103.) On June 15, 2015, AirSep filed its own Motion to Exclude Dr. Pardue from offering expert testimony as to Decedent's cause of death, and adopted by reference Lincare's briefing on the issue. (Docket No. 95.)

Also on May 15, 2015, Lincare filed a Motion for Summary Judgment and a supporting Memorandum (Docket Nos. 78 and 79), arguing that: 1) Plaintiff's claims against Lincare are prohibited under TENN. CODE ANN. § 29-28-106, which governs products-related suits against non-manufacturer lessors under Tennessee law; 2) Plaintiff does not have sufficient evidence to prove that the Concentrator was defective; 3) even if the Concentrator were defective, Plaintiff does not have sufficient evidence to prove that the Concentrator caused Decedent's death because she has failed to procure a medical causation expert; 4) Lincare did not breach any duty owed to Decedent, misrepresent the condition of the Concentrator, or breach any warranty; 5) Plaintiff has not offered sufficient evidence of emotional distress and therefore cannot prove a claim for negligent infliction of emotional distress; and 6) Plaintiff is not entitled to damages for loss of consortium. Lincare also filed a Statement of Undisputed Material Facts. (Docket No. 80.) On June 17, 2015, Plaintiff filed a Response in Opposition (Docket No. 98) along with Responses to Lincare's Statement of Undisputed Material Facts (Docket No. 99) and additional supporting documents (Docket No. 101). On July 1, 2015, Lincare filed a Reply. (Docket No. 106, Ex. 1.)

On May 15, 2015, AirSep also filed a separate Motion for Summary Judgment and supporting Memorandum (Docket Nos. 81 and 87) arguing that: 1) Plaintiff's claims against AirSep are barred by the statute of limitations; 2) Plaintiff does not have sufficient evidence to prove that the Concentrator was defective; and 3) even if the Concentrator were defective, Plaintiff does not have sufficient evidence to prove that the Concentrator caused Decedent's death because she has failed to procure a medical causation expert. AirSep also filed a Statement of Undisputed Material Facts. (Docket No. 88.) On June 17, 2015, Plaintiff filed a Response in Opposition (Docket No. 97) along with Responses to AirSep's Statement of Undisputed Material Facts (Docket No. 100) and supporting documents (Docket No. 101). On July 1, 2015, AirSep filed a Reply. (Docket No. 107, Ex. 1.)

Lastly, on May 15, 2015, AirSep filed a Motion to Exclude Tyler Kress, Ph.D., Plaintiff's proffered expert on the Concentrator defect, along with a supporting Memorandum (Docket Nos. 84 and 85). On May 26, 2015, Lincare filed its own Motion to Exclude Dr. Kress, adopting by reference and joining AirSep's motion on this issue. (Docket No. 89.) On June 1, 2015, Plaintiff filed a Response. (Docket No. 90.) On June 22, 2015, AirSep filed a Reply. (Docket No. 105.)

## SUMMARY JUDGMENT STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the

evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 252 (1986). An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

### I. Claims Against Lincare and TENN. CODE ANN. § 29-28-106

Under TENN. CODE ANN. § 29-28-106, "no product liability action" can proceed under Tennessee law against a non-manufacturer lessor of a product, where the manufacturer is both solvent and subject to service, unless the lessor has done one of the following: exercised substantial control over the aspect of the product giving rise to the alleged harm, altered or modified the product in a way that caused the harm, or provided an express warranty. Plaintiff concedes that none of these exceptions applies with respect to Lincare but argues that her negligence action against Lincare may nevertheless proceed because it is not a "product liability action" and, therefore, falls outside the scope of this provision. Product liability actions are defined under the statute as "all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of

14

any product," including "all actions based upon the following theories: strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent, or innocent; misrepresentation, concealment, or nondisclosure, whether negligent, or innocent; or under any other substantive legal theory in tort or contract whatsoever." TENN CODE ANN. § 29-28-102.

Plaintiff's theory of the case can essentially be summed up as follows: there was a defect in the Concentrator that caused it to deliver less than the prescribed amount of oxygen, Lincare negligently failed to identify the defect and delivered the Concentrator to Decedent anyway,[14] and Decedent's use of the Concentrator caused a rapid decline in her health and ultimately her death. Plaintiff argues that her claim against Lincare is for *negligence*, independent and apart from the product liability action, but in fact the only negligence asserted against Lincare is the failure to detect the alleged defect in the Concentrator. Therefore, Plaintiff's negligence action against Lincare amounts to no more than a negligence theory of personal injury and death resulting from a flaw in some aspect of the manufacture or design of a product, a product liability action under the plain text of the statute.

---

[14] In particular, Plaintiff appears to argue that the Concentrator was already not functioning properly at the time it was taken from the Prior Patient and that Lincare would have caught the problem, had it done more comprehensive testing and/or sent the Concentrator to AirSep for service prior to delivering it to Decedent. While it is not clear that this evidence is sufficient for a jury to find negligence (Plaintiff has produced no evidence about the standard of care in the medical equipment leasing industry, let alone whether additional action by Lincare would have revealed any problems in light of the fact that the alleged defect in the Concentrator is *intermittent*), the type of negligence alleged relates to harm only as caused by a product defect.

Moreover, § 29-28-106 was amended in October 2011[15] to exclude the type of action that Plaintiff now attempts to bring against Lincare. The prior version of this section, which was in effect through September 2011, explicitly allowed product liability actions against a lessor to proceed where the lessor had a "reasonable opportunity to inspect the product in such a manner which would or should, in the exercise of reasonable care, reveal the existence of the defective condition." The amendments to § 29-28-106 eliminate this clause and replace it with language that allows products actions against lessors to proceed only under the limited exceptions described above (for lessors who alter or amend the product or exercise substantial control). These amendments therefore confirm that the legislature intended to preclude actions, such as Plaintiff's, that are based on a lessor's mere negligence in identifying a product's defective condition. Accordingly, all claims against Lincare will be dismissed.[16]

## II.   Claims Against AirSep and the Statute of Limitations

As the parties agree, the statute of limitations for a products liability action under Tennessee law is one year from the date of the injury. TENN. CODE ANN. § 28-3-104. The parties also agree that the limitations period in this case began to run at the time of Decedent's death on November 20, 2011 and, therefore, expired on November 20, 2012. Plaintiff initially

---

[15] The current statute became effective on October 1, 2011 and applies to this action because none of the events giving rise to the claims took place before that time. The court notes that the parties did not mention the prior version of the statute in their briefing.

[16] Because § 29-28-106 bars all of Plaintiff's claims against Lincare, including negligence, misrepresentation, breach of warranty, and negligent infliction of emotional distress, the court does not need to address Lincare's additional arguments in its Motion for Summary Judgment that relate to Plaintiff's ability to prove either the elements of these claims or associated damages.

filed a lawsuit against Lincare in the Circuit Court of Sumner County, Tennessee on November 13, 2012, within the limitations period, and then voluntarily dismissed that suit on November 26, 2012. Plaintiff refiled her suit against Lincare in Sumner County on July 30, 2013, under TENN. CODE ANN. § 28-1-105(a) (the "Savings Statute"). The Savings Statute provides in relevant part: "If the action is commenced within the time limited by a rule or statute of limitation, but the judgment or decree rendered against the plaintiff upon any ground not concluding the plaintiff's right of action . . . the plaintiff . . . may, from time to time, commence a new action within one (1) year after the reversal or arrest." AirSep does not dispute that this second action against *Lincare* was timely as per the Savings Statute. AirSep does dispute, however, the timeliness of Plaintiff's claims against AirSep, which were first raised in Plaintiff's Amended Complaint, filed on October 4, 2013.

Plaintiff concedes that her claims against *AirSep* were filed outside of the original one-year statute of limitations period. Plaintiff also concedes that her claims against AirSep are not covered by the Savings Statute, since AirSep was not a party to the initial lawsuit. *See Turner v. Aldor Co. of Nashville*, Inc., 827 S.W.2d 318, 321 (Tenn. Ct. App. 1991) ("The savings statute is not applicable to the claims in a renewed complaint against a party not named as a defendant in the original complaint.") Plaintiff argues, however, that, because she amended her complaint to add AirSep as a defendant within 90 days of Lincare's September 9, 2013 Answer – which first identified AirSep as a party that contributed to the injury – her claims against AirSep are nevertheless timely pursuant to TENN CODE. ANN. § 20-1-119(a), which provides:

> In civil actions where comparative fault is or becomes an issue, if a defendant named in an original complaint initiating a suit filed within the applicable statute of limitations, or named in an amended complaint filed within the applicable statute of limitations, alleges in an answer or amended answer to the original or amended complaint that a person not a party to the

> suit caused or contributed to the injury or damage for which the plaintiff
> seeks recovery, and if the plaintiff's cause or causes of action against that
> person would be barred by any applicable statute of limitations but for the
> operation of this section, the plaintiff may, within ninety days of the filing
> of the first answer or first amended answer alleging that person's fault . . .
> [a]mend the complaint to add the person as a defendant . . .

As AirSep points out in its Reply, however, Plaintiff overlooks the explicit language of § 20-1-119(d), which expressly prohibits the application of § 20-1-119(a) to actions commenced pursuant to the Savings Statute. Therefore, under the plain language of the statute, Plaintiff's claims against AirSep are not saved by § 20-1-119 and will be dismissed as time-barred.

### III.    Motions to Exclude Dr. Pardue and Sufficiency of Medical Causation Evidence[17]

Defendants argue that Dr. Pardue should be excluded from testifying as to medical causation because Plaintiff has failed to properly disclose this testimony pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure and the court's deadlines under the CMO. Consequently, defendants argue that Plaintiff has failed to produce sufficient evidence as to the medical causation element of her claims, and, therefore, this action should be dismissed in its entirety as a matter of law. Plaintiff argues that she did not violate Rule 26 and the CMO; that, even if she did violate Rule 26, the error was harmless and does not warrant exclusion of Dr. Pardue's medical causation testimony; and finally that, even if Dr. Pardue's testimony is excluded, there is sufficient circumstantial evidence on medical causation in the record for her claims to survive. The court addresses each of these issues in turn.

### A.    Rule 26 Violation

---

[17] Even if the statutory bases discussed above did not apply, there are additional grounds for dismissal of this action, as explained in this section.

Under Rule 26(a)(2), parties must provide expert witness disclosures, which include, at a minimum, "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify."  With respect to witnesses who are retained or specially employed, the disclosure must be accompanied by "a written report prepared and signed by the witness" that includes the bases for the witness's opinions, facts relied on, and the witness's qualifications and prior expert testimony, among other specific itemized information.  Fed. R. Civ. P. 26(a)(2)(B).  While a treating physician may offer some expert testimony without submitting a full written expert report, that testimony is limited to opinions that were formed in the course of treatment and in reliance on his own ordinary medical training; if a treating physician plans to testify beyond the scope of his personal knowledge and render an opinion formed in anticipation of litigation, he is to be treated as a retained expert for purposes of Rule 26 disclosures.  *See Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 810-11 (6th Cir 2005) (citing *Harville v. Vanderbilt Univ.*, 95 F. App'x 719 (6th Cir 2003)); *Fielden v. CSX Transp., Inc.*, 482 F.3d 866 (6th Cir. 2007); *Bekaert Corp. v. City of Dyersberg*, 256 F.R.D. 573, 575-78 (W.D. Tenn. 2009).

Plaintiff has not filed an expert report for Dr. Pardue, or otherwise provided an official expert disclosure of Dr. Pardue under the CMO.  In fact, Plaintiff has provided no information about Dr. Pardue's medical causation testimony beyond references in her Initial Disclosures and Answers to Interrogatories to the *possibility* that Dr. Pardue might testify at trial as to certain opinions drafted by Plaintiff's own attorneys.  Plaintiff's argument that this procedural lapse does not bar Dr. Pardue from testifying as to medical causation, because he is a treating physician rather than a retained or employed expert, fails for two reasons.  First, the evidence

clearly shows that a) Dr. Pardue did not have any personal knowledge of the circumstances of Decedent's death or of the medical consequences of her use of the Concentrator, as he last treated her seven months prior to her receipt of the Concentrator and did not consult on her care in the subsequent weeks leading up to her death; and b) Dr. Pardue's opinions about the Concentrator as a contributing factor in Decedent's death were formed not in the course of treating Decedent, but in anticipation of litigation, and in collaboration with Plaintiff's attorneys. Dr. Pardue's medical causation opinions are therefore subject to the Rule 26 disclosure requirements for retained experts, irrespective of whether – as Plaintiff asserts – Dr. Pardue was not paid for his opinions, did not have direct communication with Plaintiff's counsel, and did not enter into any sort of formal retention agreement.

Second, Plaintiff has failed to provide even the limited Rule 26 disclosures required for a treating physician whose testimony does not necessitate a full written expert report. From the record, Plaintiff managed to properly disclose Dr. Pardue as a fact witness only. Plaintiff's Initial Disclosures and Answers to defendants' Interrogatories did not provide sufficient notice of Plaintiff's final intent to use Dr. Pardue as an expert witness, nor did they contain an express summary of the facts and opinions Dr. Pardue would testify to at trial. In fact, these documents on their face reflect ambiguity as to Plaintiff's use of expert testimony, as does Plaintiff's subsequent communication with defense counsel.[18] Therefore, on the narrow, but critical,

_____

[18] Plaintiff argues that the July 2014 email correspondence between counsel for AirSep and counsel for Plaintiff shows that defendants had notice that Dr. Pardue would offer expert testimony on medical causation and recognized him accordingly. Even if this is true, it does not change the fact that Plaintiff subsequently failed to follow up in providing defendants with sufficient knowledge regarding Dr. Pardue's anticipated medical causation testimony at trial, as expressly required under Rule 26 and the CMO. Moreover, Plaintiff's counsel was clear in

question of whether Dr. Pardue may testify as to the Decedent's cause of death, the record shows that Plaintiff has failed to disclose Dr. Pardue as a medical causation expert pursuant to Rule 26 and the CMO.

### B. Harmlessness and The Exclusion of Dr. Pardue's Testimony

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). A showing of harmlessness for this purpose requires "an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Sommer v. Davis*, 317 F.3d 686, 692 (6th Cir. 2003) (citing *Vance v. United States*, 1999 WL 455435 at *5 (6th Cir. June 25, 1999)). Under Rule 37, the district court retains discretion to fashion a remedy for Rule 26 violations (*see Roberts ex rel. Johnson v. Galen of Va, Inc.*, 325 F.3d 776, 784 (6th Cir 2003)), and the exclusion of an expert witness' testimony is an available option that courts in this circuit commonly exercise when a party does not comply with the court's expert witness disclosure deadlines. *See, e.g., Haynes v. City of Circleville*, 2005 WL 3263313 (S.D. Ohio Dec. 1, 2005); *Hall v. Furest*, 2006 WL 2375677 at *3 (E.D. Mich. Aug 16, 2006).

Plaintiff argues that any Rule 26 error she committed is harmless and that, therefore, Dr. Pardue's testimony should not be excluded. Plaintiff further asserts that there may still be time to depose Dr. Pardue prior to the deadline for motions *in limine*, which can address any further concerns about the admissibility of his opinions. First, the court does not accept Plaintiff's argument that she made an honest mistake. Plaintiff ignored the distinction between Dr.

---

response to AirSep's July 2, 2014 email that a final decision as to expert testimony had not yet been made and, at that point in time, the CMO deadline for expert disclosures had not yet passed.

Pardue's role as a fact witness and her counsel's explicit attempt to effectively retain Dr. Pardue to testify as to medical causation opinions drafted by Plaintiff's attorneys in anticipation of litigation. Plaintiff could not have reasonably believed that Dr. Pardue could testify as to these opinions without providing official disclosures and a full expert report. Moreover, the CMO was modified many times, at the request of the parties and to account for Dr. Pardue's ongoing unavailability as a *fact witness.*[19] Plaintiff failed to adequately address Dr. Pardue's ongoing unavailability by either requesting an additional extension for her own expert disclosures, until such time as Dr. Pardue could provide a proper expert report, or seeking out an alternative expert on this issue before the deadline had expired. Plaintiff instead allowed all deadlines for expert disclosures to pass without any update, despite her explicit indication to defendants – in discovery documents and in outside communications – that she was aware of and would comply with the expert disclosure deadlines contained in the CMO to clarify her intentions with respect to Dr. Pardue. Plaintiff cannot now reasonably argue that she was unaware that these deadlines were relevant to Dr. Pardue.

Second, even if Plaintiff's error was based on an honest mistake, defendants did not have sufficient knowledge to render the mistake harmless. Defendants never received a final answer

---

[19] In its final amendment to the CMO, the court ordered that defendants could delay disclosing their medical experts until after Dr. Pardue's deposition. This fact alone, however, does not indicate that Dr. Pardue was understood to be a medical causation expert. Even as a fact witness and as a treating physician, he may have brought out facts that defendants would have wanted to retain an expert to rebut, such as the medical necessity of Decedent's oxygen supplementation or the role of any other medical conditions with which she may have been diagnosed or treatments she may have received. Nonetheless, Dr. Pardue was never made available for deposition, the final deadlines came and went, and Plaintiff never requested any additional extensions. Defendants named their medical experts and proceeded with other procedural steps under the CMO.

from Plaintiff clarifying her intent to proffer Dr. Pardue as a medical causation expert at trial. They have never received a full summary of Dr. Pardue's proposed expert opinions on this issue or the facts upon which these opinions are based. Moreover, defendants have never had an opportunity to review a full expert report or to depose Dr. Pardue.[20] Consequently, the defendants have named their own medical experts and filed dispositive motions without this information. Accordingly, the court finds that Plaintiff's violation of Rule 26 and the CMO was not harmless.

Finally, the court notes that allowing Dr. Pardue to testify as an expert on medical causation at this point in time would require the court to reset the entire trial schedule and to rewind the clock and revisit several procedural steps, including defendants' identification of medical experts and the filing of dispositive motions. For these reasons, Dr. Pardue's testimony as to the cause of Decedent's death will be excluded.[21]

### C. Sufficiency of Medical Causation Evidence to Support Plaintiff's Claims

---

[20] Plaintiff argues that, because Dr. Pardue's unavailability was through no fault of her own, and because defendants failed to subpoena Dr. Pardue after the final deadline for his deposition was set, this fact cannot be used against her to argue that defendants did not have sufficient knowledge of Dr. Pardue's expert testimony to render the Rule 26 violation harmless. What Plaintiff overlooks, however, is that, having not provided any disclosures regarding the bases for Dr. Pardue's medical causation testimony, it was her responsibility to have ensured that defendants had adequate knowledge before assuming this testimony could be used at trial.

[21] The court need not reach defendants' argument that Dr. Pardue's testimony is inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). The court notes, however, that Plaintiff's argument that a *Daubert* analysis would be premature – given that the bases for Dr. Pardue's medical causation opinions are unavailable for review – reinforces the fact that defendants have not received sufficient knowledge of Dr. Pardue's medical causation testimony.

Under Tennessee law, a plaintiff must provide admissible expert testimony as to both causation and product defect in order to prove liability in a products action. *Pride v. BIC Corp.*, 218 F.3d 566, 58-81 (6th Cir. 2000) (citing *Fulton v. Pfizer Hosp. Prod. Group, Inc.*, 872 S.W.2d 908, 912 (Tenn Ct. App. 1993) and *Browder v. Pettigrew*, 541 S.W.2d 402, 404 (TN 1976)); Moreover, under Tennessee law, medical causation must be established by expert testimony. *Thomas v. Aetna*, 812 S.W.2d 278, 283 (citing *Smith v. Empire Pencil Co.*, 781 S.W.2d 833 (Tenn. 1989); *Corcoran v. Foster Auto GMC, Inc.*, 746 S.W.2d 452 (Tenn. 1988); and *Seay v. Town of Greeneville*, 587 S.W.2d 381 (Tenn. 1979)); *Downs v. Perstorp Components, Inc.*, 26 F. App'x 472 (6th Cir. 2002) (without admissible expert testimony as to the medical causation of plaintiff's condition, no reasonable jury could find for product liability plaintiff under Tennessee law, on a theory of either negligence or strict liability.); *see also Jastrebski v. Smith & Nephew Richards, Inc.*, 1999 WL 144935 at *6 (Tenn. Ct. App. March 18, 1999) (in a lawsuit involving a "technically complex prescription medical device," "expert testimony is required to establish the causal connection between the alleged defect in the device and [the plaintiff's] claimed injuries.")

Plaintiff cannot succeed in this action unless she can prove that Decedent's death was caused by the defect in the Concentrator. Plaintiff's argument that the circumstantial evidence is sufficient runs counter to both legal precedent and the evidence in the record. The Concentrator is a complicated medical device, and, without expert testimony, a jury would be unable to draw conclusions about the possible effects of a defect in an oxygen concentrator on any patient, let alone the actual effect of the alleged defects in the Concentrator on Decedent. Decedent's full medical condition at the time she entered the hospital, and between that time and her death, as well as any other intervening factors that may have contributed to the decline in her health

24

(including her request to not be placed back on a ventilator), are also beyond the jury's ability to understand without expert testimony. It would be impossible for a jury to determine, based on the circumstantial evidence alone, that a defect in the Concentrator caused or contributed to Decedent's death.

Dr. Pardue is not permitted to offer expert testimony as to medical causation for the reasons discussed above, and Plaintiff has proffered no other expert testimony on this matter. She has not retained a medical causation expert or identified any of the physicians who actually treated Decedent at the time of her death as having formed an opinion as to medical causation in the scope of their treatment. Absent any expert testimony on this issue, no jury can find for Plaintiff. The claims against Lincare and AirSep will therefore be dismissed on the additional ground that Plaintiff cannot prove the medical causation element of her claims.[22]

## **CONCLUSION**

For the foregoing reasons, Lincare's and Airsep's Motions for Summary Judgment and Motions to Exclude Dr. Pardue will be granted and all claims will be dismissed with prejudice. The Motions to Exclude Dr. Kress will be denied as moot.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

[22] Having already established more than one ground for dismissal as to each defendant, the court need not reach the additional question of the sufficiency of Plaintiff's evidence as to the product defect element of her claims. Accordingly, the court will not address the admissibility under Rule 702 of testimony by Plaintiff's proffered defect expert, Dr. Kress, and the Motions to Exclude Dr. Kress will be denied as moot.